FILED

MAR 2 7 2008

ENTERED

MAR 27 2008

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                    Deputy Clerk

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:05-30583-TD |
| KATAYONE ADELI, | Chapter 7 |
|        Adeli. | Adv. No. 2:05-02644-TD |
| RICHARD B. SACHS, | |
|        Plaintiff, | **FINDINGS OF FACT**<br>**AND CONCLUSIONS OF LAW** |
| v. | |
| KATAYONE ADELI, | **TRIAL:** |
|        Defendant. | Date:    October 25, 2007<br>Time:    10:00 a.m. |

**CLOSING ARGUMENTS:**
Date:     December 21, 2007
Time:     10:00 a.m.

Place:     Courtroom 1345
           255 E. Temple St.
           Los Angeles, CA

**FINAL BRIEFING DATE:**
February 1, 2008

On October 25, 2007, at the above-referenced date, time and location, the court conducted a trial (the "Trial") regarding the claims for relief arising under 11 U.S.C. § 727[1] (the "727 Claims") asserted by Richard B. Sachs, plaintiff herein ("Sachs"), against Katayone Adeli, the Chapter 7 debtor and defendant herein ("Adeli"), in Sachs' First Amended Complaint Seeking (I) Denial of Adeli's Discharge Pursuant to 11 U.S.C. § 727; or, in the Alternative, (II) Denial of Adeli's Discharge as to Sachs' Claims Pursuant to 11 U.S.C. § 523 (the "FAC").[2]

Craig M. Rankin and Todd M. Arnold of Levene, Neale, Bender, Rankin & Brill L.L.P. appeared on behalf of Adeli. Frank A. Merola and Nathan A. Schultz of Stutman, Treister & Glatt, Professional Corporation, appeared on behalf of Sachs.

Upon consideration of (A) the Joint Pretrial Order entered by the court on August 14, 2007 (the "PTO"); (B) the Trial testimony of Adeli, Paul Brent, Esq. ("Brent"), Paul Samuels, Esq. ("Samuels"), Carl Waldman, Esq. ("Waldman"), and Roxanne Modjallal ("Modjallal"); (C) the deposition transcripts of Adeli [Tr. Ex. 29], Brent [Tr. Ex. 31], Samuels [Tr. Ex. 37], Waldman [Tr. Ex. 36], Modjallal [Tr. Ex. 28], Mehri Majidi ("Majidi") [Tr. Ex. 30], Gloria L. Pica ("Pica") [Tr. Ex. 38], Lynne Van Auken ("Auken") [Tr. Ex. 39], Susan Schneiderman, Esq. ("Schneiderman") [Tr. Ex. 32], Howard Bader, Esq. ("Bader") [Tr. Ex. 35], Chris Mulardelis, Esq. ("Mulardelis") [Tr. Ex. 33], and Michael Shepard ("Sheppard"

---

[1] All section references herein are to 11 U.S.C. § 101 et seq. (the "Bankruptcy Code")

[2] Sachs' claims for relief against Adeli arising under 11 U.S.C. § 523 that were asserted in the FAC were severed for the purposes of the Trial and deferred for later hearing.

1  and, together with Schneiderman, Bader, Mulardelis, the "New York

2  Lawyers") [Tr. Ex. 34], together with all exhibits to such

3  transcripts; (D) the following additional Trial exhibits;

| Exhibit No. | Description |
|---|---|
| 1 | 9/21/2005 Application for Leave to Employ Attorney Under General Retainer Agreement; Declaration of Non-Adversity; Statement of Disinterestedness. |
| 2 | 5/17/2005 Washington Mutual Bank Official Check No. 078227263 to Steinberg, Nutter & Brent Trust Acct. for $35,000.00.  (WM - 001110) |
| 3 | Excerpt of 11/22/2005 Transcript of §341(a) Meeting of Creditors. |
| 4 | Excerpt of 12/6/2005 Transcript of §341(a) Meeting of Creditors. |
| 5 | 12/8/2005 Check No. 2973 from Roxanne Modjallal to Katayone Adeli for $37,000.00.  12/8/2005 Check No. 2974 from Roxanne Modjallal to Katayone Adeli for $356.19. |
| 6 | 1/1/2004 Kader, Inc. Defined Benefit Pension Plan and Trust. |
| 7 | 10/21/2005 Filing of Debtor's Schedules, Statement of Financial Affairs, and Lists. |
| 8 | 4/7/2005 Judgment in Richard B. Sachs vs. Katayone Adeli, Sean P. Barron, Klothes, LLC, Klothes (NY), LLC, and John Does, 1-10. |
| 9 | Washington Mutual Bank Account Number 871-124124-4 Statement from 3/12/2005 thru 4/13/2005 for Katayone Adeli.  (WM - 000172 to WM - 000173) |
| 10 | 3/31/2005 Valley National Bank Statement of Account for Kader Inc.  (VN 000049, VN 000053, VN 000056, VN 000059, VN 000062, VN 000064) |
| 11 | 10/23/2007 Fax from L. Holland to N. Schultz. Attaching Katayone Adeli Official Checks. |
| 12 | 8/19/2006 Declaration of Katayone Adeli in Support of Debtor's Opposition to Motion for Summary Judgment Denying Debtor a Discharge Pursuant to 11 U.S.C. § 727(A)(2). |
| 13 | Excerpt of 4/12/2007 Deposition of Susan Schneiderman. |
| 14 | Excerpt of 4/12/2007 Deposition of Chris Mularadelis. |
| 15 | Excerpt of 4/12/2007 Deposition of Michael Sheppard. |
| 16 | Excerpt of 4/12/2007 Deposition of Howard Bader. |

| 17 | 6/27/2005 Bank of America Check Number 0999 from Katayone Adeli to Kader Inc. for $100,000.00. |
| 18 | Excerpt of 11/22/2005 Transcript of §341(a) Meeting of Creditors. |
| 19 | Declaration of Katayone Adeli. |
| 20 | Excerpt of 1/16/2006 Rule 2004 Examination of Katayone Adeli. |
| 21 | 8/17/2006 Settlement Agreement. |
| 22 | Spreadsheet from Roxanne Modjallal for K. Adeli Account: 03927-03492. |
| 23 | U.S. Trustee Operating Report for Katayone Adeli for the Month Ending 9/30/2005. |
| 24 | U.S. Trustee Operating Report for Katayone Adeli for the Month Ending 10/31/2005. |
| 25 | U.S. Trustee Operating Report for Katayone Adeli for the Month Ending 11/30/2005. |
| 26 | U.S. Trustee Operating Report for Katayone Adeli for the Month Ending 12/31/2005. |
| 27 | Demonstrative Trial Exhibit - Chart of Adeli Accounts. |
| 40 | 11/22/2005 Transcript of §341(a) Meeting of Creditors. |
| 41 | 12/6/2005 Transcript of §341(a) Meeting of Creditors. |
| 42 | 1/16/2006 Rule 2004 Examination of Katayone Adeli. |

(E) Sachs' Opening Trial Brief; (F) Adeli's Trial Brief; (G) Sachs' Reply to Adeli's Trial Brief; (H) the arguments of counsel made at the Trial; (J) the closing arguments of counsel presented to the court on December 21, 2007; and further briefing provided by both Sachs and Adeli on both January 25, 2008, and February 1, 2008; and further based on the court's conclusion that Adeli's Trial testimony was credible and in all material ways consistent with the Trial testimony of Brent, Samuels, Waldman, and Modjallal, the court hereby makes the following Findings of Fact and Conclusions of Law:

**INTRODUCTION**

This dispute apparently arises from a failed business arrangement between Adeli (debtor and defendant) and Sachs (plaintiff).  Sachs recovered a $727,358.52 judgment in a New York state court against Adeli.  Sachs seeks a judgment here that Adeli should be denied a discharge pursuant to §§ 727(a)(2)(A) and 727(a)(4)(A).  The following findings and conclusions are based largely on (A) the Joint Pretrial Order entered herein and (B) the live testimony and other evidence received at trial on October 25, 2007, as well as other matters of which I have taken judicial notice from the record in Adeli's bankruptcy case.

**FINDINGS OF FACT[3]**

1.   Adeli is an artist.  She has no legal or formal business training.  She is unsophisticated in legal matters.

2.   Prior to 1998, Adeli purchased a one-bedroom condominium residence located at 9950 Durant Avenue, No. 408, Beverly Hills, California (the "Condo").  [PTO Admitted Fact ("PTOAF"), ¶ A.1]

3.   Adeli's mother has lived in the Condo since Adeli purchased it.

4.   Kader, Inc. ("Kader") is a New York corporation, wholly-owned by Adeli, incorporated on or about October 24, 2003.  [PTOAF, ¶ A.60]

---

[3] Where necessary or appropriate for the purposes of Fed. R. Bankr. P. 7052, Findings of Fact shall be construed as Conclusions of Law, and vice versa.

5. On or about December 17, 2003, Sachs commenced a lawsuit against Adeli and other defendants in the Supreme Court of the State of New York, County of New York (the "New York Trial Court"), Index No. 603930/03 (the "State Court Action"). [PTOAF, ¶ A.3]

6. The State Court Action involved many claims and numerous defendants other than Adeli, including Klothes, LLC ("Klothes"), an entity co-owned by Sachs and Adeli. One State Court Action claim involved Sachs' attempt to recover over $700,000 from Adeli, resulting from his purchase of bank debt owed by Klothes, which Sachs and Adeli had co-guarantied. (the "Guaranty Claim").

7. On or about July 15, 2004, the New York Court denied Sachs' motion for partial summary judgment in the State Court Action and dismissed the Guaranty Claim (the "Initial State Court Decision"). [PTOAF, ¶ A.4; Tr. Ex. 8]

8. On or about July 26, 2004, Sachs appealed the Initial State Court Decision to the New York Supreme Court, Appellate Division (the "Appellate Division"). [PTOAF, ¶ A.5]

9. Prior to February 14, 2005, Adeli took out a mortgage (the "First Mortgage") secured by a first priority trust deed on the Condo for Washington Mutual Bank ("Washington Mutual") for approximately $146,000. [PTOAF, ¶ A.6]

10. On or about February 14, 2005, Washington Mutual approved Adeli for an equity credit line authorizing her to draw up to approximately $193,000 (the "Equity Line"). [PTOAF, ¶ A.7]

11. A second priority trust deed on the Condo secured the Equity Line. [PTOAF, ¶ A.8]

12. On March 10, 2005, the Appellate Division reversed the Initial State Court Decision, instructing the New York Trial Court

1  to enter partial summary judgment in the State Court action on the

2  Guaranty Claim in Sachs' favor (the "March 10 Decision").   [See

3  PTOAF, ¶ A.11; Tr. Ex. 8]

4      13.  Adeli's New York Lawyers believed that the March 10

5  Decision contradicted applicable California law regarding co-

6  guarantors' rights and obligations.

7      14.  On or about April 7, 2005 (the "Judgment Date"), pursuant

8  to the March 10 Decision, the New York Court entered in the State

9  Court Action a partial judgment favoring Sachs (the "Judgment").

10  [PTOAF, ¶ A.12]

11     15.  The Judgment was for $727,358.52, exclusive of interest

12  and attorneys' fees.   [PTOAF, ¶ A.13]

13     16.  On April 11, 2005, Adeli filed a motion seeking leave to

14  appeal the March 10 Decision and the Judgment (the "Appeal

15  Motion").   [PTOAF, ¶ A.18]

16     17.  On April 11, 2005, the Appellate Division granted an

17  interim stay of execution on the Judgment (the "Interim Stay")

18  pending determination of Adeli's Appeal Motion.   [PTOAF, ¶ A.19]

19     18.  Adeli understood that, after the Judgment Date, her New

20  York Lawyers advised her to temporarily move her funds and Kader's

21  funds out of New York and into the name of a family member or

22  trusted friend in California so that Sachs would not improperly

23  levy on Adeli's or Kader's assets in violation of the Interim Stay.

24  Adeli had moved to California from New York prior to the Judgment

25  Date.

26     19.  Prior to the Judgment Date, Adeli maintained a checking

27  account in her name at Valley National Bank, Account Number

28  83232435 (the "Adeli Valley National Account").   [PTOAF, ¶ A.20]

20. Prior to the Judgment Date, Adeli maintained an investment account in her name at Bear Stearns, Account Number 720-56777 38G (the "Bear Stearns Account").   [PTOAF, ¶ A.23]

21. Prior to the Judgment Date, Adeli, as manager of Kader, controlled a checking account in the name of "Kader, Inc." at Valley National Bank, Account Number 45400229 (the "Kader Valley National Account").   [PTOAF, ¶ A.24]

22. On April 11, 2005, Adeli drew $150,000 on the Equity Line (the "Equity Line Funds").   [PTOAF, ¶ A.25]

23. Adeli drew the $150,000 in Equity Line Funds to pay her ordinary, regular, and personal living expenses, to assist in the payment of her mother's living expenses, to re-establish herself as a designer through Kader or otherwise, to fund a potential business venture with Modjallal, to pay attorney fees and expenses related to the State Court Action, which was still pending, and to pay legal fees and expenses related to dealing with the Judgment.

24. Adeli did not draw on the Equity Line at an earlier date because she did not want to draw on the Equity Line and pay interest until it became necessary to use these funds to pay her personal and business expenses.

25. On April 12, 2005, Adeli and Modjallal opened a checking account in Modjallal's name at Bank of America, Account Number 20070-40107 (the "Shared Modjallal Account").   [PTOAF, ¶ A.26]

26. On April 12, 2005, Adeli deposited the Equity Line Funds in the Shared Modjallal Account (the "Equity Line Deposit").   [PTOAF, ¶ A.27]

27.  On April 11, 2005, Adeli transferred $33,000 from Adeli Valley National Account to the Kader Valley National Account (the "$33,000 Valley National Transfer").  [PTOAF, ¶ A.31]

28.  On April 19, 2005, Adeli wired (the "$58,000 Wire Transfer") $58,000 (the "Valley National Funds") from the Kader Valley National Account to a Bank of America checking account in Modjallal's name, Account Number 03927-03492 (the "Personal Modjallal Account").  [PTOAF, ¶ A.36]

29.  On or about April 14, 2005, Adeli sold the securities in the Bear Stearns Account (the "Bear Stearns Sale").  [PTOAF, ¶ A.39]

30.  On or about April 19, 2005, Adeli withdrew $15,406.36 from the Bear Stearns Account (the "Bear Stearns Withdrawal"). This amount represented the Bear Stearns Sale proceeds.  [PTOAF, ¶ A.41]

31.  On May 12, 2005, the Appellate Division denied the Appeal Motion (the "May 12 Decision").  [PTOAF, ¶ A.45]

32.  On or about May 16, 2005, Sachs filed a motion in the Appellate Division seeking to vacate and/or modify any remaining stay of the Appellate Division dated April 11, 2005 based upon the May 12 Decision (the "Stay [Vacation] Motion").  [PTOAF, ¶ A.55] On June 23, 2005, the Appellate Division rendered a decision (the "June 23 Decision") denying Sachs' Stay [Vacation] Motion as "unnecessary," and referencing the May 12 decision which denied Adeli's Appeal Motion.  [PTOAF, ¶ A.56]

33.  The Interim Stay was in effect from April 11, 2005, until May 12, 2005, and may have been in effect thereafter.  Sachs threatened criminal contempt actions against Adeli, according to

1  Brent.    These  threats  were  discussed  by  counsel  for  Sachs  and
2  Adeli,  particularly  Brent,  in  hearings  before  me  in  the  fall  of
3  2005 shortly after Adeli commenced her bankruptcy case in September
4  2005 as a Chapter 11 voluntary debtor. I take judicial notice of
5  the discussion, though I am unaware that any sanction was ordered.

6      34.  Sachs' counsel and Adeli's New York Lawyers, according to
7  Brent, disagreed whether the Interim Stay remained effective after
8  May 12, 2005.

9      35.  Adeli's New York Lawyers advised her at the time that
10 Sachs and his counsel were highly aggressive and might levy on her
11 assets or on Kader's New York assets despite the Interim Stay and
12 the fact that the Judgment named only Adeli, not Kader.

13      36.  For  the  following  transfers,  the  Interim  Stay  was
14 effective or, at minimum, Adeli reasonably believed based on her
15 good  faith  reliance  on  her  New  York  Lawyers'  advice  that  the
16 Interim Stay was effective and prohibited Sachs from levying on her
17 assets: (1) when Adeli drew $150,000 on the Equity Line; (2) when
18 she made the $150,000 Equity Line Deposit into the Shared Modjallal
19 Account;  (3)  when  she  made  the  $33,000  Valley  National  Transfer
20 from the Adeli Valley National Account to the Kader Valley National
21 Account;  (4)  when  she  made  the  $58,000  Wire  Transfer  to  the
22 Personal Modjallal Account; and (5) when she made the Bear Stearns
23 Withdrawal (collectively the "First 2005 Transfers").   Based on the
24 evidence, Sachs did not levy on Adeli's assets, either in New York
25 or in California, pursuant to the New York Judgment at any time
26 prior  to  Adeli  filing  her  Chapter  11  bankruptcy  petition  on
27 September 8, 2005.

28

37.    There was a great deal of disagreement in the trial and deposition testimony and legal argument about Adeli's New York Lawyers' advice.    In the end, I find Adeli's trial and deposition testimony highly credible and persuasive.    Samuels' trial testimony corroborates Adeli's trial and deposition testimony regarding the advice Adeli received from her New York Lawyers shortly after the April 7, 2005 New York Judgment.    I find her New York Lawyers' deposition testimony self-serving and not persuasive; it is not consistent with my view of the totality of the evidence.

38.    At the time Adeli made the First 2005 Transfers, she reasonably and in good faith believed that her New York Lawyers had advised her to move her funds and Kader's funds out of New York and into the name of a family member or trusted friend in California to protect them from the possibility of an improper levy by Sachs.

39.    Adeli did not make any of the First 2005 Transfers with the intent to hinder or delay improperly or to defraud Sachs.

40.    Adeli intended the First 2005 Transfers as a temporary measure, to protect her assets (which collectively were insufficient to pay the Judgment) from what Adeli reasonably believed was a threatened and improper levy by Sachs.

41.    Adeli made the following transfers to protect her assets from unreasonable and unlawful conduct by Sachs and his lawyers while she appealed the Sachs Judgment: the Equity Line Deposit, the $33,000 Valley National Transfer, the $58,000 Wire Transfer, the Bear Stearns Transfer, the $100,000 Kader Deposit, the $80,000 Gilmore Deposit, the July 28 Deposit, the $40,000 Gilmore Transfer, the Condo Interest Transfer, and the $30,000 Payment Transfer.    She made these transfers based on the advice of her New York litigation

1  lawyers and, perhaps, partly under the New York Court's   stay
2  issued in her favor.   Adeli did not act with fraudulent intent.
3  She did not materially impede any proper Sachs collection effort.

4      42.  Sachs did not levy on any Adeli assets, which he was
5  entitled to pursue, at any time prior to Adeli's bankruptcy.

6      43.  Prior to the Judgment and after, Adeli employed Samuels
7  as her general legal counsel and strongly relied on his
8  professional training, judgment, and advice in making many of her
9  legal decisions.

10     44.  After making the First 2005 Transfers, Adeli contacted
11 Samuels.  Adeli fully disclosed to Samuels all of the First 2005
12 Transfers at her first post-Judgment meeting with him.   At that
13 time, Adeli also informed Samuels that she had made the First 2005
14 Transfers based on advice she received from her New York Lawyers.
15 Adeli further informed Samuels at that meeting with Samuels that
16 she was concerned about the legal ramifications of the First 2005
17 Transfers.

18     45.  In May 2005, Samuels referred Adeli to Brent, whom
19 Samuels regarded as an experienced and knowledgeable bankruptcy
20 lawyer, to advise her on the First 2005 Transfers and bankruptcy
21 issues and to represent her in any bankruptcy case that she might
22 file.   Brent has represented several Chapter 11 debtors in my
23 courtroom over the past 14 years.   Brent is an experienced,
24 resourceful, and effective Chapter 11 debtor's lawyer in my
25 judgment.

26     46.  In May 2005, Adeli retained Brent to advise her regarding
27 the First 2005 Transfers and bankruptcy issues and to represent her
28 in any bankruptcy case that she might file.

47.  Adeli fully disclosed all of the First 2005 Transfers to Brent at her first meeting with him.  At that time, Adeli also fully informed Brent that she had made the First 2005 Transfers based on advice she received from her New York Lawyers.  Adeli further informed Brent that she was worried about the First 2005 Transfers and knew that such transfers would be scrutinized and attacked by Sachs and his counsel if there were any apparent or actual improprieties.  There was conflict between Adeli's testimony and Brent's recollections of his early discussions with Adeli.  On balance, I found both of them to be highly credible witnesses.  Where there was a conflict between Adeli and Brent in their testimony, I found Adeli's testimony to be the most credible and persuasive.  In the end, Brent advised Adeli not to undo the transfers.

48.  To avoid bankruptcy, Brent worked in conjunction with Adeli's New York Lawyers to settle both Sachs' and Adeli's claims in the State Action resulting from the Judgment.  The parties did not settle, though Brent treated settlement with Sachs as his primary goal.  Brent also concerned himself with Adeli's practical needs to find new work, to earn money, and to reestablish herself in her chosen line of work outside of New York.  Brent also was mindful of a possible Adeli bankruptcy filing, the Sachs Judgment, and Adeli's asset deficiency related to the New York Judgment.  Additionally, Brent was cognizant of Adeli's ongoing personal, family, and financial obligations, and of Adeli's ongoing business needs.

49.    Because Adeli and Brent could not settle with Sachs, both Adeli and Brent understood that Sachs would continue to pursue his collection rights, even if Adeli filed bankruptcy.

50.    The evidence and the witnesses' demeanor demonstrates that Adeli relied heavily on Samuels and Brent for legal guidance regarding the First 2005 Transfers and in Adeli's efforts to be sure that her conduct and financial records were beyond reproach by Sachs or any other creditor.

51.    Neither Brent nor Samuels advised Adeli to undue the First 2005 Transfers.    Regardless of his apprehensions, Brent advised Adeli that she should leave the funds where they were and that she could use the funds in the Shared Modjallal Account and the Personal Modjallal account for Kader's business expenses and Adeli's personal expenses.    Brent advised Adeli that she should not transfer all of the funds in the Personal Modjallal account to a Kader account or all of the funds in the Shared Modjallal account to a personal Adeli account.    As he testified, Brent advised Adeli in the foregoing manner because he believed that further transfers would exacerbate existing problems with the transfers and increase Sachs' suspicions.

52.    Brent testified that he was unaware in 2005 of First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343-46 (9th Cir. 1986), but that in retrospect, if he had been aware of the decision he would have advised Adeli to transfer all of the funds in the Personal Modjallal account to a Kader account and all of the funds in the Shared Modjallal account to a personal Adeli account.

53.    If Brent or Samuels had advised Adeli to transfer all of the funds in the Personal Modjallal account to a Kader account or

-14-

1  all of the funds in the Shared Modjallal account to a personal
2  Adeli account, I am convinced by the evidence that Adeli would have
3  done so.   In managing her accounts, Adeli did not interfere with or
4  deprive Sachs of any legal right he had; she did not cheat or
5  deceive Sachs. Rather, she sought to pursue her personal goals of
6  reestablishing herself in California, confronting and resolving her
7  debt to Sachs and her differences with Sachs, and employing her
8  California legal advisors to achieve what she believed were proper
9  and responsible reorganization purposes.    She did this by
10 attempting to settle with Sachs, by filing for bankruptcy, and by
11 pursuing her normal ongoing personal and business activities.
12 These activities were undertaken to benefit all of her prepetition
13 creditors, including Sachs, as well as to make her fresh start
14 after the disappointment of her New York business failure with
15 Sachs.

16    54.  Shortly after retaining Brent, Adeli informed him that
17 one of her goals was to protect her mother's residence in the Condo
18 by selling her mother an interest in the Condo.    Adeli informed
19 Brent that she wanted to ensure that any sale of an interest in the
20 Condo to her mother was legal and would not jeopardize her right to
21 a bankruptcy discharge.

22    55.  In the spring and summer of 2005, Adeli acted honestly
23 and in good faith with these goals in mind.   She believed that she
24 listened to and followed the advice of each of her seven lawyers
25 (four in New York and three in California) advising her at the
26 time.   She cooperated with each of her lawyers, giving them full,
27 complete, consistent, and accurate information about her assets,
28 liabilities, and affairs.

56.   Samuels  assisted  Adeli  to  evaluate,  negotiate,  and document selling the Condo interest to Adeli's mother, Mehri Majidi ("Majidi").    Adeli  retained  California  attorneys  Weintraub & Selth to represent Majidi in the sale.

57.   On or about June 1, 2005, Adeli and her mother entered into a Purchase Agreement, providing for Adeli to transfer a 25 percent interest in her Condo to her mother in return for a $30,000 payment (the "Condo Purchase Agreement").    [PTOAF, ¶ A.48]    At the time, and under the circumstances, Adeli reasonably believed that the price fairly approximated the market value of her 25 percent equity interest in the Condo.

58.   Adeli  did  not  dictate  the  specific  terms  of  the  Condo Purchase Agreement;   the professionals retained to represent Adeli and  Majidi  drafted  it.    They  based  its  drafting  on  financial realities and the overriding direction from Adeli that she wanted a legal transaction, beyond reproach by Sachs or any other creditor, notwithstanding her legal and financial difficulties with Sachs. This was so even though Adeli paid Majidi's lawyer and sat with Majidi to translate and explain the advice and documents provided to Majidi, who does not speak English, from Majidi's lawyers.

59.   On August 25, 2005 (the "Condo Transfer Date"), Adeli executed a Grant Deed (the "Grant Deed") transferring a 25 percent interest in the Condo (the "Condo Interest") to Majidi (the "Condo Interest Transfer").    [PTOAF, ¶ A.80]

60.   The  Condo  Interest  Transfer  and  its  terms  were  based  on Brent's and Samuel's advice. The Condo Interest Transfer was made on behalf of Majidi, at Adeli's specific request, and with Adeli's help, as well as with help from Weintraub & Selth.

-16-

1      61. Adeli's brother and sister gave Adeli two checks totaling

2 $30,000 (the "$30,000 Payment") in payment for Adeli's transfer of

3 the Condo Interest to Adeli's mother. [PTOAF, ¶ A.84]

4      62. The $30,000 Payment consisted of (i) a $20,000 check (the

5 "$20,000 Check"), dated August 25, 2005 from Max Adeli, Adeli's

6 brother, to Adeli, and (ii) a $10,000 check (the "$10,000 Check"),

7 dated August 25, 2005 from Homa Adeli, Adeli's sister, to Adeli.

8 [PTOAF, ¶ A.85]

9      63. Adeli endorsed the $20,000 Check and the $10,000 Check to

10 Paul H. Samuels, or his office, to pay him to represent her with

11 respect to Sachs' efforts to domesticate the Judgment in California

12 and for related matters (the "$30,000 Payment Transfer"). [See

13 PTOAF, ¶ A.87]

14      64. The $30,000 Payment is arguably less than the value of 25

15 percent of Adeli's equity in the Condo at the time of the Condo

16 Interest Transfer (JPTO ¶¶ 6-7, 49-50; Plaintiff's Trial Exhibit 7

17 at Schedule A). That claim, however, as articulated by Sachs, was

18 disputed by Adeli and has been settled amicably between Adeli and

19 Adeli's Chapter 7 Trustee, a fact of which I take judicial notice

20 based on Adeli's bankruptcy case record.

21      65. As part of what Brent considered appropriate pre-

22 bankruptcy planning, he advised Adeli to set up a pension through

23 Kader. On or about May 28, 2005, Adeli retained Waldman (her third

24 California lawyer), an attorney specializing in estates, tax, and

25 business planning. Waldman assisted Adeli in domesticating Kader

26 in California and creating a Kader pension plan for Adeli's

27 benefit. [PTOAF, ¶ A.47] Waldman advised Adeli that she could

28 make the Pension Plan effective as of 2004, which would allow for a

1  contribution for 2004 and 2005 because Kader's 2004 tax returns had
2  not yet been filed.    Waldman prepared the Pension Plan and all
3  related    Pension    Plan    documents,    including    the    Pension
4  Certification, based on his professional knowledge and expertise.

5      66.  On or about June 8, 2005, Adeli executed a "Kader, Inc.
6  Defined Benefit Pension Plan and Trust" (the "Pension Plan", which
7  included a certification that the Pension Plan was adopted by
8  resolution    executed    "on"    December    31,    2004    (the    "Pension
9  Certification").    [PTOAF,    ¶    A.51]    Waldman    credibly    and
10 convincingly explained in his testimony that "on" was [his]
11 scrivener's error and that he should have said "as of December 31,
12 2004."

13     67.  Waldman advised Adeli to fund a general bank account and
14 a Kader pension fund account.  He also advised Adeli to contribute
15 $80,000 to the pension fund account.  Waldman concluded that this
16 was the maximum allowable contribution for 2004 and 2005, as
17 determined by actuaries Waldman employed for that purpose.

18     68.  On June 27, 2005, Adeli opened a business checking
19 account in Kader's name at Gilmore Bank, Account Number 1197010
20 (the "First Gilmore Checking Account").    [PTOAF, ¶ A.58]

21     69.  On June 27, 2005, Adeli opened an additional business
22 checking account in Kader's name at Gilmore Bank, Account Number
23 1197029 (the "Second Gilmore Checking Account").    [PTOAF, ¶ A.59]

24     70.  On June 27, 2005, Adeli wrote a $100,000 check drawn on
25 the Shared Modjallal Account, payable to Kader, Inc. (the "$100,000
26 Kader Check").    [PTOAF, ¶ A.61]

27

28

71. On June 27, 2005, Adeli deposited the $100,000 Kader Check into the First Gilmore Checking Account (the "$100,000 Kader Deposit").  [PTOAF, ¶ A.62]

72. On June 27, 2005, Adeli wrote an $80,000 check, drawn on the First Gilmore Checking Account, payable to Kader (the "$80,000 Check").  [PTOAF, ¶ A.65]

73. On June 27, 2005, Adeli deposited the $80,000 Check into the Second Gilmore Checking Account (the "$80,000 Gilmore Deposit").  [PTOAF, ¶ A.66]  She made the $80,000 Gilmore Deposit to fund the Pension Plan.  These transactions were based directly on Waldman's advice.

74. Paul Brent testified that he was unaware that Adeli funded the Pension Plan with proceeds from the $100,000 Kader Deposit (Transcript of Trial Proceedings, October 25, 2007, Brent testimony, at 47:25-48:17), but Adeli testified persuasively that she told both Samuels and Brent about her funding of the Pension Plan in May 2005.  I am persuaded by the evidence that Brent, whose employment was terminated by Adeli in 2006, simply forgot this detail by the time he testified in the October 25, 2007 trial of this adversary.  Brent's memory lapse seems understandable given the many details he discussed with Adeli in 2005 as he tried, unsuccessfully, to settle with Sachs and to avoid an Adeli bankruptcy.

75. On July 28, 2005, Adeli deposited $4,589.21 into the Shared Modjallal Account (the "July 28 Deposit").  [PTOAF, ¶ A.69]

76. On August 12, 2005, Adeli transferred $40,000 from the Second Gilmore Checking Account to the First Gilmore Checking

1   Account via two checks, each for $20,000 (the "$40,000 Gilmore
2   Transfer"). [PTOAF, ¶ A.74]

3       77. Adeli made the $40,000 Gilmore Transfer because she
4   needed the money to pay normal expenses.

5       78. Adeli at all times had unfettered access to the Shared
6   Modjallal Account; she either devoted all of the funds in the
7   account to her normal, ongoing expenses before she filed her
8   bankruptcy petition, or she accounted for them when they became
9   assets of her bankruptcy estate.

10      79. Adeli made the following prepetition transfers based on
11  her lawyers' advice: the $100,000 Kader Deposit into the First
12  Gilmore Account, the $80,000 Gilmore Deposit into the Second
13  Gilmore Account, the $40,000 Gilmore Transfer from the Second
14  Gilmore Account to the First Gilmore Account, the July 28 Deposit,
15  the Condo Interest Transfer, the $30,000 Payment Transfer, as well
16  as all withdrawals from the Personal Modjallal Account, the Shared
17  Modjallal Account, and the First Gilmore Account (collectively the
18  "Second 2005 Transfers"). Brent was aware of these transfers and
19  did not advise Adeli that she could not make them or should undo
20  transfers previously made. Samuels was aware of the transfers
21  establishing the Kader Pension Plan and he discussed them with
22  Brent. These transfers appeared to be normal and proper to Adeli's
23  lawyers.

24      80. While Sachs points to many "suspicious" prepetition
25  transfers, claiming that Adeli transferred her property intending
26  to "hinder, delay, or defraud" him in violation of § 727 (a)(2)(A),
27  the Supreme Court in an earlier statutory dispute warned against
28  reading the bankruptcy statutes mechanically. Bank of Marin v.

England, 385 U.S. 99 at 103 (1966) ("we do not read . . . statutory words with the ease of a computer.    There is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction.")

81. Adeli did not make any of the Second 2005 Transfers intending to hinder, delay, or defraud any creditor.    Rather, she sought to temporarily protect her assets from Sachs and his "very aggressive" New York lawyers' improper collection efforts while she tried to fulfill her personal and business needs, which included facing up to the Sachs Judgment in a responsible way.

82. Any transfers between Adeli and Kader had no material effect on Sachs' efforts to collect on his judgment or on the value of Adeli's bankruptcy estate.    In fact, there is no evidence of any collection action by Sachs prior to Adeli's bankruptcy petition, other than domesticating the New York Judgment in California shortly before Adeli filed her Chapter 11 petition.    Transfers from Adeli to Kader increased the always uncertain value of Adeli's 100 percent equity interest in Kader which was acknowledged in Adeli's Schedules.    Transfers from Adeli to Kader maintained the value of Adeli's estate on a dollar for dollar basis.    None of the transfers between Adeli and Kader actually hindered, delayed, or defrauded Sachs or any other Adeli creditor.    No Adeli or Kader transfer hindered, delayed, or defrauded Sachs, or in any way cheated him out of any lawful process that he properly asserted against Adeli prepetition.

83. Adeli made all withdrawals from the Personal Modjallal Account, the Shared Modjallal Account, and the First Gilmore Account to pay her personal and business expenses that were

1 ordinary, reasonable, and, for the most part, well documented. She
2 withdrew cash prepetition in relatively nominal amounts to pay for
3 her normal personal and business needs.

4    84.  Modjallal used none of the Adeli money for Modjallal
5 purposes.

6    85.  In connection with her bankruptcy case, including
7 prepetition and postpetition expenditures, Adeli made no false
8 oath, knowingly or fraudulently, at any time.  She acted to keep
9 her financial affairs private.  Most people do before they file a
10 voluntary bankruptcy.  When she filed her bankruptcy papers she
11 accounted for all of her assets, liabilities, and financial
12 transactions truthfully and under oath.

13    86.  Adeli made all withdrawals from the Personal Modjallal
14 Account, the Shared Modjallal Account, and the First Gilmore
15 Account based on Brent's advice and with Samuel's knowledge.

16    87.  Adeli commenced her bankruptcy case by filing a voluntary
17 petition under Chapter 11 on September 8, 2005 (the "Petition
18 Date").  [PTOAF, ¶ A.122]

19    88.  Shortly after the Petition Date, Brent asked Modjallal to
20 turn over all remaining funds belonging to Adeli.  Modjallal
21 promptly turned over all such funds by delivering to Brent two
22 checks drawn on the Personal Modjallal Account and the Shared
23 Modjallal Account.  Brent lost these checks, but promptly after he
24 discovered his error and notified Modjallal, she replaced them.

25    89.  Thus, on November 18, 2005, Brent sent a letter to
26 Modjallal making a second request that Modjallal turn over all
27 monies belonging to Adeli.  [PTOAF, ¶ A.106]

28

90.  On December 8, 2005, Modjallal wrote a $37,000 check (the "$37,000 Check") on the Personal Modjallal Account payable to Adeli.  [PTOAF, ¶ A.110]

91.  Modjallal sent the $37,000 Check to Brent, who subsequently turned over the funds to Adeli's Chapter 7 trustee.  [PTOAF, ¶ A.112]

92.  On December 8, 2005, Modjallal wrote a $356.19 check (the "$356.19 Check") on the Shared Modjallal Account payable to Adeli.  [PTOAF, ¶ A.107]

93.  Modjallal sent the $356.19 Check to Brent, who subsequently turned over the funds to Adeli's Chapter 7 trustee.  [PTOAF, ¶ A.109]

94.  Adeli timely filed her Schedules of Assets and Liabilities (the "Schedules" and each, "Schedule") and her Statement of Financial Affairs (the "SOFA"), with my written consent, on October 21, 2005.  [PTOAF, ¶ A.123]

95.  Adeli made an oath under penalty of perjury that she read the answers contained in her SOFA, and any attachments, and that such answers were true and correct to the best of her knowledge.  [PTOAF, ¶ A.124]

96.  Adeli made an oath under penalty of perjury that she read her Schedules and that they were true and correct to the best of her knowledge, information, and belief.  [PTOAF, ¶ A.125]

97.  Brent prepared Adeli's Schedules and SOFA after Adeli's full and accurate disclosure.  He did so with full knowledge of the First 2005 Transfers, the Second 2005 Transfers, and all matters material to the preparation of Adeli's Schedules and SOFA.  Brent conferred with Samuels regarding the content of the Schedules and

-23-

1  SOFA.   Adeli relied on her highly experienced bankruptcy lawyer's,

2  and to some extent, her general California lawyer's, training and

3  experience when she signed her Schedules and SOFA.   She did so

4  carefully and in good faith, with no intent to conceal, evade, or

5  deceive Sachs or her creditors.

6      98.   Brent's recollections at trial, more than two years after

7  representing Adeli, were understandably imperfect.   Adeli's

8  testimony regarding her discussions with each of her seven lawyers

9  in 2005 was thorough, consistent, highly credible, and persuasive.

10  I am persuaded that any discrepancies between Adeli's and Brent's

11  testimony resulted from Brent's prolonged absence from involvement

12  with Adeli's legal affairs.

13      99.   Adeli reasonably relied on her lawyers to prepare

14  accurate Schedules and to prepare an accurate SOFA.   She reasonably

15  believed that these papers properly reflected all of the

16  information that she disclosed to and discussed with her lawyers.

17  Adeli disclosed and discussed this information with her lawyers to

18  avoid any question of a § 727 violation that any creditor or

19  trustee might later assert.

20      100. On Question 9 of her SOFA, Adeli disclosed the $30,000

21  Payment Transfer.

22      101. On Question 10 of her SOFA, Adeli disclosed the Condo

23  Interest Transfer.

24      102. On Question 10 of her SOFA, Adeli acknowledged the April

25  1, 2005 $208,000 transfer to Modjallal, including the $150,000

26  Equity Line Deposit into the Shared Modjallal Account and the

27  $58,000 Wire Transfer into the Personal Modjallal Account.

28

1    103. Adeli responded accurately to Question 10 of her SOFA
2    which asks: "List all other property . . . transferred within one
3    year immediately preceding the commencement date of this case," <u>not</u>
4    "what was the net amount of funds transferred within one year
5    before commencement after deducting expenditures."   Adeli fully
6    accounted for her prepetition expenditures from the Shared
7    Modjallal Account.   Adeli used those funds for proper purposes.
8    She answered every question put to her in this bankruptcy case and
9    adversary truthfully and properly under the circumstances.   Adeli
10   did not deceive Sachs.

11   104. On Question 11 of her SOFA, Adeli properly disclosed
12   closing the Adeli Valley National Account, the Kader Valley
13   National Account, the Bear Stearns Account, and the Bank of America
14   Account.

15   105. Adeli's Schedule A lists the current market value ("<u>CMV</u>")
16   of Adeli's Condo interest at $525,000, without deducting any
17   secured claim or exemption.   [PTOAF, ¶ A.126]

18   106. Item No. 2 on Adeli's Schedule B lists the following
19   items as having a $360 CMV: Adeli's checking, savings, or other
20   financial accounts, certificates of deposit, or shares in banks,
21   savings and loan, thrift, building and loan, homestead
22   associations, credit unions, or brokerage houses.   [PTOAF, ¶ A.127]
23   This disclosure was accurate and proper.   Brent intended it to
24   convey the balance remaining in the Shared Modjallal Account as of
25   the Petition Date.

26   107. Item No. 11 on Adeli's Schedule B lists an "Interest in
27   ERISA Qualified Pension" as having a $40,000 CMV.   [PTOAF, ¶ A.128]

28

1    108. Item No. 12 on Adeli's Schedule B lists a "100 Interest
2  in Kader, Inc." as having an "unknown" CMV.  [PTOAF, ¶ A.129]

3    109. Brent listed Adeli's 100 percent Interest in Kader, Inc.,
4  this was based on his opinion that "Kader was a personal services
5  company and its value was, therefore, not necessarily the balance
6  of assets after deducting liabilities."  The Schedule B answer was
7  accurate, proper, and not intended to deceive Sachs; the answer did
8  not deceive Sachs.

9    110. Item No. 33 on Adeli's Schedule B lists "other personal
10 property of any kind not already listed" as having a $35,000 CMV.
11 With this disclosure, Brent intended to convey the Personal
12 Modjallal Account's remaining balance as of the Petition Date.  The
13 disclosure was reasonably accurate.

14    111. Schedule C lists a $40,000 claimed exemption for an
15 "Interest in [an] ERISA Qualified Pension".  [PTOAF, ¶ A.130]

16    112. Schedule C lists an exemption of 0.00 for a "100%
17 Interest in Kader, Inc."  [PTOAF, ¶ A.131]

18    113. None of the information in Adeli's Schedules and SOFA was
19 improper, inaccurate, intended to deceive Sachs or any other Adeli
20 creditor, her Chapter 7 Trustee, or the United States Trustee.
21 Adeli did not knowingly or fraudulently make any false oath in her
22 bankruptcy papers.

23    114. With the $37,000 Check and $356.19 Check, Adeli recovered
24 for her estate, promptly and in a business-like manner, the funds
25 remaining in the Personal Modjallal Account and the Shared
26 Modjallal Account as of the Petition Date.  Any previous
27 withdrawals were made by Adeli to pay Adeli's normal personal and
28 business, prepetition and debtor in possession, expenses.

115. On January 17, 2006, Adeli filed with the Office of the United States Trustee (the "OUST") monthly operating reports ("MOR") for September, October, November, and December 2005 (collectively the "MORs").    [PTOAF, ¶ A.139]

116. Adeli timely provided her attorneys and accountants full access to her bank accounts and records to help them prepare the MORs.

117. Adeli's accountants prepared the MORs, and Brent reviewed them before they were filed.

118. Any alleged inaccuracies in the MORs resulted from mistake or inadvertence by Adeli, or by the professionals retained by Adeli.    Inaccuracies may have also resulted from Adeli's fall 2005 business travels to the Far East.

119. None of the statements regarding material facts in the MORs were both false and made either knowingly or fraudulently by Adeli.    Rather, Adeli's business travel, her stays in China, and her reliance on lawyers and accountants caused some errors.    These errors stemmed from practical difficulties that Adeli and her professionals faced while preparing and filing the MORs.    Further problems resulted from commonly experienced and understandable, debtor-in-possession-banking-difficulties, which Brent persuasively explained at trial.    Adeli and her professionals faced these difficulties during the early phase of her bankruptcy case.    There was no wrongdoing.    None of the errors were material, especially considering the favorable earnings and business results that Adeli achieved as a Chapter 11 debtor and debtor in possession during that time period, including the November 2005 commencement of her

$41,667 monthly salary from her new employment with Seven for All Mankind ("Seven"), a clothing manufacturer, as discussed below.

120. Adeli did not knowingly or fraudulently make any false oath in her MORs. Sachs was not deceived.

121. All Adeli transfers were made in the ordinary course of Adeli's circumstances. They were not wrongful, false, or fraudulent concerning Sachs. Adeli acted properly to facilitate her changed circumstances. These circumstances included Adeli's relocation to California to search for a new job and other business opportunities as a successful, sought after clothes designer.

122. There was nothing that was knowingly false or fraudulent about any of Adeli's postpetition conduct, her testimony or statements in this litigation, or in Adeli's bankruptcy papers. From May 2005 through the date immediately preceding the Petition Date, Adeli spent about $150,000 of the funds that she had deposited in the Shared Modjallal Account (JPTO ¶101) for ordinary, personal, business, and legal expenses. Such expenses were necessary, especially when considering her goals of supporting herself and pursuing legitimate business opportunities.

123. Shortly after filing her Chapter 11 petition, Adeli negotiated and received an important written contract proposal with a three-year term from Seven. As an independent contractor, Adeli's monthly salary was proposed to be $41,667. She received her first monthly salary payment from Seven in November 2005, as reflected in her monthly operating report (MOR) filed with the United States Trustee's Office (Ex. 25). The proposed Seven contract included significant royalty opportunities for Adeli, who was then a debtor in possession pursuing a Chapter 11

1   reorganization of her liabilities.    Adeli's contract was approved
2   by Adeli's Chapter 7 Trustee and by my order in due course.    The
3   foregoing is based on the record in Adeli's bankruptcy case, later
4   converted to Chapter 7, on Sachs' motion, as to all of which I take
5   judicial notice.    By October 2006, Adeli had voluntarily settled
6   with her Chapter 7 Trustee essentially all of the financial
7   wrongdoing claims asserted in this lawsuit, as asserted by Sachs.
8   The settlement between Adeli and her Chapter 7 Trustee represented
9   a reasonable plan to repay Adeli's creditors from the proceeds of
10  Adeli's Seven contract.    I approved this settlement over Sachs'
11  vigorous objection in an oral ruling and in an order entered in
12  Adeli's bankruptcy case on October 11, 2006.    See Exhibit 21.

13      124. The Sachs Judgment rendered Adeli insolvent.    Each of
14  what Sachs has characterized as a "Transfer" was made while Adeli
15  was insolvent.    The evidence here could lead to conflicting
16  inferences, but I conclude that Adeli did not move funds
17  fraudulently or with an intent to avoid paying Sachs the money she
18  owed him.

19      125. While the Sachs pleadings and briefs in this adversary
20  speak repeatedly about "fraud," there is no evidence of conduct on
21  Adeli's part that Adeli intended to deceive, cheat, or defraud
22  Sachs    (meaning,    generally    in    a    bankruptcy    context,
23  "misrepresentation of material fact intended to deceive, that the
24  victim justifiably relied on, and that proximately resulted in
25  damage to the victim").

26      126. The evidence reveals that, pre-petition, Adeli acted
27  privately, as most people do with regard to their financial
28  matters.    She made a series of private decisions to rearrange her

1  affairs to reflect her lack of success in her New York business
2  activities, to facilitate her ongoing efforts to get back on her
3  feet, and to secure new business opportunities from a California
4  base.   There is no evidence that any Adeli act from April 2005
5  until her bankruptcy filing in September 2005 was intended to, or
6  did, deprive Sachs of any remedy that he was entitled to and
7  properly sought through any legal process.

8      127. While Sachs asserts that Adeli acted with actual intent
9  to hinder, delay, or defraud him and that he has established by the
10 evidence many of the "badges of fraud" recognized in Emmett Valley
11 Assoc. v. Woodfield (In re Woodfield), 978 F.2d 516 (9th Cir. 1992),
12 Sachs has failed to prove by a preponderance of the evidence that
13 Adeli is guilty of any wrongdoing.

14     128. Adeli never placed anything beyond Sachs' reach; she
15 never hindered, delayed, or defrauded Sachs.   Cf. id. at 519.   In
16 Woodfield, the court found active wrongdoing towards creditors on
17 the debtor's part that was clearly material.   By contrast, Adeli
18 acknowledged her financial difficulties by filing bankruptcy under
19 Chapter 11 and pursuing business opportunities as a Chapter 11
20 debtor and debtor in possession.   Adeli did not cheat Sachs out of
21 recovering on the New York Judgment.   Repayment of Sachs was
22 reasonably provided out of Adeli's assets through Adeli's business
23 efforts.   Such a recovery was provided for, if not guaranteed, by
24 the settlement agreement with Adeli's Chapter 7 Trustee, which I
25 approved by my October 11, 2006 order in Adeli's bankruptcy case.

26     129. In the end, the evidence proves conclusively that Adeli
27 used her pre-New York Judgment resources lawfully prepetition; she
28 used all her resources postpetition to pay Sachs and her creditors.

1  She worked to exploit her talent for clothes design to benefit
2  herself, her family, and her creditors.    She continued these
3  efforts during her Chapter 11 bankruptcy case and even after
4  conversion of her bankruptcy to Chapter 7.

5      130. At the same time, it is telling that Sachs' closing brief
6  filed on February 1, 2008 repeatedly invokes the term "fraud," or
7  some derivative thereof, to characterize Adeli's conduct.    After
8  fully considering all of the evidence and testimony, however, I
9  find as follows: nothing in the record establishes (1) that Adeli
10  tried to cheat or deceive Sachs; (2) that she misrepresented any
11  material fact to him; (3) that she failed to account for her assets
12  or activities; or (4) that she caused Sachs any loss through
13  wrongful conduct.    Sachs overstates, especially in his use of the
14  term "fraud."

15      131. I note finally that Sachs did not testify, either by
16  deposition (to my knowledge) or in the trial of this matter.

17
18      132. As a footnote, I take judicial notice from the record in
   Adeli's bankruptcy case of the following:    Adeli's contract with
19
   Seven was terminated June 27, 2007.    That apparently left Adeli
20
   unable to make ongoing payments to her Chapter 7 Trustee as
21
   required by her 2006 settlement agreement with the Trustee.
22
   Shortly after, the Trustee sued Adeli, Kader, and Sachs in August
23
   2007, in order to exercise the Trustee's right to collateral
24
   pledged by Adeli under the settlement agreement.    Those lawsuits
25
   were settled this year in simultaneous, cross-referenced agreements
26
   between the Trustee and Adeli and between the Trustee and Sachs.
27
   Before the 2008 settlements, the Trustee had recovered about
28

$265,000 in cash payments received from Adeli under the 2006 settlement. Under the latest settlements, the Trustee believes she will recover about $200,000 more from Adeli's pledged assets. This will bring the Trustee's total recovery for the estate to about $465,000. Sachs agreed to waive his claim to a prepetition lien against Adeli's assets while reserving all his unsecured claims against Adeli, including his § 523 claims. (Sachs' 523 claims in this adversary were severed for possible later trial.) Releases were exchanged in each agreement. Adeli received the right to any claim she has to royalties due to her under her now-terminated Seven contract. The recent settlements were approved on the Trustee's motion, after notice, without objection or hearing. An order was entered to that effect on March 11, 2008.

133. The Trustee's prospective recovery of $465,000 from Adeli exceeds the approximate $400,000 liquidation value of Adeli's prepetition assets as of the Sachs Judgment date, April 12, 2005. It would appear from the foregoing that Adeli, as a bankruptcy debtor, has acted responsibly toward Sachs and her other creditors.

## CONCLUSIONS OF LAW

### JURISDICTION

A. This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334.

B. Venue in this court is proper pursuant to 28 U.S.C. § 1409, as this adversary proceeding arises under and in connection with a case under Title 11 which is pending in this District.

C.   This is a core proceeding as defined by 28 U.S.C. §
157(b) (2) (J).

**WAIVER OF CLAIMS**

D.   By way of the Joint Pretrial Order, Sachs only sought to
prove his § 727(a)(2)(A) Claims based on the following
transactions: (1) the Equity Line Deposit; (2) the $33,000 Valley
National Transfer; (3) the $58,000 Wire Transfer; (4) the Bear
Stearns Withdrawal; (5) the $100,000 Kader Deposit; (6) the $80,000
Gilmore Deposit; (7) the July 28 Deposit; (8) the $40,000 Gilmore
Transfer; (9) the Condo Interest Transfer; and (10) the $30,000
Payment Transfer (collectively the "Subject Transfers"). PTO, at
¶¶ C.1 - C.21 & B.1 - B.10.

E.   By way of the Joint Pretrial Order, Sachs only sought to
prove his § 727(a)(4)(A) Claims based on the following evidence:
(1) Adeli's SOFA Question 10 Response; (2) statements in the MORs
signed by Adeli; and (3) Adeli's statements regarding the Equity
Line, the Wire Transfer, the $100,000 Kader Deposit, the $80,000
Gilmore Deposit, her use of the funds in the Personal Modjallal
Account and the Shared Modjallal Account for "ordinary," "regular,"
and/or "personal" expenses, and Adeli's statements regarding the
balance of funds remaining in the Personal Modjallal Account and
the Shared Modjallal Account as of the Petition Date (collectively,
the "Subject Statements").

F. By way of the Joint Pretrial Order, Sachs only sought to prove causes of action under §§ 727(a)(2)(A) and 727(a)(4). PTO, at ¶ C.1 - C.21.

G. The Joint Pretrial Order supersedes the pleadings. PTO, at ¶ J; Local Bankruptcy Rule 7016-1(b)(2)(J).

H. Based on the foregoing, (1) Sachs waived his right to prove his § 727(a)(2)(A) Claims based on transfers other than the Subject Transfers; (2) Sachs waived his right to prove his § 727(a)(2)(A) Claims based on statements other than the Subject Statements; and (3) Sachs waived his right to seek a denial of Adeli's discharge pursuant to all other subsections of § 727, including, but not limited to, §§ 727(a)(3) and 727(a)(5).

I. It clearly appears from the Joint Pretrial Order that Sachs waived his claims under § 727(a)(3) concerning Adeli's previously alleged failure to keep records and to document information from which Adeli's financial condition and business transactions might be ascertained [to paraphrase § 727(a)(3)]. Regardless of that waiver, Adeli thoroughly explained any loss of assets and deficiency of assets to meet her liabilities. In addition, Adeli made voluntary, thorough, and court-approved written settlement agreements in 2006 and 2008, which reasonably will lead to recovery by Sachs and any other Adeli creditor for any loss of assets or deficiency in Adeli's assets to meet her prepetition liabilities.

**SECTION 727(a)(2)(A) CLAIMS**

J.    Sachs has the burden of proving his objections to Adeli's discharge pursuant to § 727(a)(2)(A). Fed. R. Bankr. P. 4005; accord Aubrey v. Thomas (In re Aubrey), 111 B.R. 268, 272 (9th Cir. BAP 1990).

K.    Section 727(a)(2)(A) "must be construed liberally in favor of [Adeli] and strictly against [Sachs]." Beauchamp v. Hoose (In re Beauchamp), 236 B.R. 727, 730 (9th Cir BAP 1999); Devers v. Bank of Sheridan, Montana (In re Devers), 759 F.2d 751, 754 (9th Cir. 1985).

L.    To prevail on his claims under § 727(a)(2)(A), Sachs must prove that: (1) Adeli transferred or concealed property; (2) the subject property belonged to Adeli; (3) the transfer occurred within one year of Adeli's Petition Date; and (4) Adeli executed the transfer with the intent to hinder, delay, or defraud a creditor. Aubrey, 111 B.R. at 273.

M.    A debtor does not violate § 727(a)(2)(A) by establishing and funding a pension plan in conjunction with pre-bankruptcy exemption planning. Gill v. Stern (In re Stern), 345 F.3d 1036, 1044-1045 (9th Cir. 2003).

N.    No § 727(a)(2) claims exist where the debtor (1) made the subject transfers in good faith reliance on the advice of counsel (the "Advice of Counsel Exception"), or (2) has disclosed the subject transfers, made an effort to recover the property that was

transferred and actually does recover the property (the "Disclose and Recover Exception").   First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343-46 (9th Cir. 1986); see also Avco Fin. Services of Billings v. Sullivan (In re Sullivan), 111 B.R. 317, 322 (Bankr. D. Mont. 1990) ("Incorrect advice of counsel should not be imputed against the Debtor under § 727."); Rice v. Creative National Systems, Inc. (In re Rice), 109 B.R. 405 (Bankr. E.D. Cal. 1989).   In addition, Adeli clearly employed her assets properly, for normal prepetition and postpetition expenses.   She fully accounted for her use of assets.   None of Adeli's expenditures or her written or testimonial accounts of them were knowingly false or fraudulent.   Nowhere in this bankruptcy case did she make a false oath or account.

O.   Adeeb states that in a voluntary bankruptcy case, transfers must be recovered before the petition date; in an involuntary bankruptcy case, transfers can be recovered after the petition date.   In this case, the principles of Adeeb and § 727 should be interpreted broadly enough to include Adeli's exculpatory pre- and postpetition conduct.   See Bank of Marin v. England, 385 U.S. at 103.   First, the prepetition conduct was no worse than suspicious; none of it was materially wrongful.   Adeli's post-transfer and postpetition conduct has been exemplary.   The essence of Adeeb's holding is that disclosure should be voluntary and complete and that all disclosed assets should be made available to

1  the estate's creditors.   None of Adeli's transfers was material.

2  None resulted in a wrongful diminution of Adeli's prepetition

3  assets.   None of Adeli's prepetition transfers was fraudulent,

4  deceitful, or designed to cheat Sachs.   All of Adeli's assets were

5  fully disclosed and made available to creditors of the estate

6  promptly and cooperatively by Adeli.   Adeli and Adeli's Chapter 7

7  Trustee quickly settled any doubts or claims against Adeli in a

8  businesslike manner.   A full recovery for Adeli's prepetition

9

10 creditors is in prospect.

11      P.   I take judicial notice, sua sponte, of the fact that in

12 2006, Adeli settled several significant avoidance claims with her

13 Chapter 7 Trustee, over Sachs' objections and after a hearing.   The

14 net effect of the settlement was to return to the Adeli bankruptcy

15 estate every transfer questioned by the Trustee.   I approved the

16

17 settlement in a ruling that I outlined orally on the record at the

18 hearing and in an order entered October 11, 2006.   Adeli's conduct

19 differs significantly in Adeli's favor from the debtor's culpable

20 conduct as discussed in Devers, 75 F.3d at 754.

21      Q.   The court should take into account a debtor's lack of

22 sophistication and the totality of the debtor's conduct when

23

24 determining whether the debtor possessed the intent required to be

25 proved by a preponderance of the evidence by a creditor seeking

26 denial of discharge under § 727(a)(2)(A).   See In re Greene, 340

27 B.R. 93 (Bankr. M.D. Fla. 2006); see also Citibank South Dakota v.

28

1  Dougherty (In re Dougherty), 84 B.R. 653, 657 (9th Cir. BAP 1988)(a

2  debtor's level of financial sophistication is one of the facts

3  relevant to determining intent in the context of

4  nondischargeability actions); accord American Express Travel

5  Related Servs. Co. Inc. v. Hashemi (In re Hashemi), 104 F.3d 1122,

6

7  1125 (9th Cir. 1996), cert. denied, 520 U.S. 1230, 117 S.Ct. 1824,

8  137 L.Ed.2d 1031 (1997).

9       R.   Based upon my Findings of Fact, and after balancing all

10 the possible inferences from the evidence, I conclude that Sachs

11 did not meet his burden and that no basis exists to deny Adeli's

12 discharge under § 727(a)(2)(A).  None of the Subject Transfers was

13 intended to hinder, delay, or defraud Sachs or any other Adeli

14

15 creditor.   Each was, or led directly to, an ordinary and proper

16 expenditure by Adeli, was made with the knowledge and advice of

17 counsel, or was properly accounted for, and recovered, to the

18 extent necessary to exonerate Adeli.

19 **SECTION 727(a)(4)(A) CLAIMS**

20      S.   Sachs has the burden of proving his objection to Adeli's

21 discharge pursuant to § 727(a)(4)(A).   Fed. R. Bankr. P. 4005;

22 accord Aubrey 111 B.R. at 272.

23

24      T.   Section 727(a)(4)(A) "must be construed liberally in

25 favor of [Adeli] and strictly against [Sachs]."   Beauchamp, 236

26 B.R. at 730; accord Devers, 759 F.2d at 754.

27

28

U.   In order to prevail on his claim under § 727(a)(4)(A), Sachs must prove that: (1) Adeli knowingly and fraudulently made a false oath; and (2) the oath related to a material fact.   11 U.S.C. § 727(a)(4)(A).   Aubrey, 111 B.R. at 274.

V.   A person acts knowingly only if she acts deliberately and consciously.   Roberts v. Erhard (In re Roberts), 331 B.R. 876, 884 (9th Cir. BAP 2005).   Accordingly, "[a] debtor will not be denied a discharge if a false statement is due to mistake or inadvertence." Brown, 108 F.3d at 1293; see Roberts, 331 B.R. at 884 (a careless and reckless approach to a reporting duty does not rise to the level of "knowing").   "Moreover, an honest error or mere inaccuracy is not a proper basis for denial of a discharge."   Id.   The evidence before me stands in sharp contrast to the evidence of wrongdoing that the court had before it in Khalil v. Developers Sur. & Indem. Co. (In re Khalil), 379 B.R. 163 (9th Cir. BAP 2007); in Hansen v. Moore (In re Hansen), 368 B.R. 868 at 877-78; and in Aubrey, 11 B.R. at 273-74.

W.   Based upon the Findings of Fact, I conclude that Sachs did not meet his burden and that there exists no basis for denying Adeli's discharge under § 727(a)(4)(A).   Roberts, 331 B.R. at 883-85.   None of the Subject Statements were (1) false, and (2) made knowingly and fraudulently, and (3) related to a material fact.

X.   There were many unusual or suspicious Adeli transfers post-Judgment and prepetition, but upon careful examination of all

1  the evidence and circumstances in this dispute, I conclude that

2  Adeli acted in good faith and on the advice of her attorneys.  At

3  the same time, Sachs did not initiate any enforcement action during

4  Adeli's prepetition period that was interrupted or frustrated by

5  Adeli's conduct.   When Adeli filed bankruptcy she honestly

6  disclosed her assets.    Adeli conducted her bankruptcy case

7  truthfully and without deception.    Adeli cooperated with her

8  Chapter 7 Trustee and settled voluntarily the allegations of

9  misconduct against her, with my approval, after notice and a

10 hearing and over Sachs' objection.  Adeli has voluntarily met her

11 prepetition obligations to Sachs and her other creditors.

12     Y.   Judgment on Sachs' 727 claims in this adversary should be

13 entered in favor of Adeli.

14     March 27, 2008

15

16

17                         _Thomas B. Donovan_

18                          THOMAS B. DONOVAN
                            BANKRUPTCY JUDGE

19

20

21

22

23

24

25

26

27

28

-40-

1

## NOTICE OF ENTRY OF JUDGMENT OR ORDER
## AND CERTIFICATE OF MAILING

2

TO ALL PARTIES IN INTEREST LISTED BELOW:

3

   1.  You are hereby notified that a judgment or order entitled:

4

**FINDINGS OF FACT AND CONLCUSIONS OF LAW**

5

was entered on ___3/27/08___ .

6

   2.  I hereby certify that I mailed a true copy of the order or judgment to the persons and

7

entities listed below on ___3/27/08___ .

8

<u>Plaintiff's Attorneys</u>
9
Isaac Pachulski
Frank Merola
10
Nathan Schultz
1901 Avenue of the Stars, 12th Floor
11
Los Angeles, CA  90067

12
Aaron Richard Golub
42 East 64th Street
13
New York, NY  10021

14
<u>Debtor/Defendant</u>
Katayone Adeli
15
9950 Durante Drive, No. 408
Beverly Hills, CA 90212
16
<u>Debtor/Defendant's Attorneys</u>
17
Craig Rankin
Todd Arnold
18
Levene Neale Bender Rankin & Brill
10250 Constellation Blvd., Ste. 1700
19
Los Angeles, CA  90067

20
<u>Chapter 7 Trustee</u>
Nancy Knupfer
21
Danning, Gill, Diamond & Kollitz
2029 Century Park East, 3rd Floor
22
Los Angeles, CA  90067-2904

23
Office of the U. S. Trustee
Ernst & Young Plaza
24
725 S. Figueroa St., 26th Floor
Los Angeles, CA 90017
25

26
Dated: 3/27/08

27
                                 Clerk

28